**Opinion issued June 14, 2018**



In The

# Court of Appeals

### For The

# First District of Texas

———————————

## NO. 01-17-00120-CV

———————————

**DR. JAIME CLAVIJO AND MANOR CARE – SHARPVIEW OF HOUSTON, TEXAS, LLC, Appellants**

**V.**

**GARY LYNN FOMBY, Appellee**

———————————

**On Appeal from the 133rd District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-19064**

———————————

## MEMORANDUM OPINION

In this interlocutory appeal,[1] appellants, Dr. Jaime Clavijo ("Clavijo") and

Manor Care – Sharpview of Houston, Texas, LLC ("Manor Care"), challenge the

---

[1]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(10) (West Supp. 2017).

trial court's denial of their motions to dismiss the health care liability claims[2] brought against them by appellee, Gary Lynn Fomby. In two issues,[3] Clavijo contends that the trial court abused its discretion in denying his motion to dismiss the claims against him because Fomby's medical expert is not qualified to opine as to the applicable standard of care and the expert's report[4] is inadequate as to the element of causation. In two issues,[5] Manor Care contends that the trial court abused its discretion in denying its motion to dismiss the claims against it because Fomby's medical expert is not qualified to opine as to the applicable standard of care and causation and the expert's report[6] is inadequate as to the standard of care and causation.

We affirm, in part, and reverse and remand, in part.

## Background

In December 2013, Fomby underwent cardiac surgery at Memorial Hermann Hospital in Houston. During the procedure, a vein was harvested from his right leg,

---

[2]    *See id.* § 74.001(a)(13) (West 2017).

[3]    Although Dr. Clavijo presents three issues, his third issue, in which he generally challenges the trial court's order dismissing Fomby's claims is, in fact, part of his first and second issues. Accordingly, we address Clavijo's two substantive issues.

[4]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2017).

[5]    Although Manor Care also presents three issues, its third issue, in which it generally challenges the trial court's order dismissing its claims is, in fact, part of its first and second issues. Accordingly, we address Manor Care's two substantive issues.

[6]    *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

2

resulting in a 20-inch incision, extending from above his knee to midway down his lower leg (the "surgical leg wound"). On January 13, 2014, Fomby was discharged to Manor Care for post-operative care of the surgical leg wound and for physical therapy. Dr. Clavijo was Fomby's admitting physician at Manor Care.

In his original petition, Fomby, proceeding pro se, alleged that, beginning on January 14, 2014, Manor Care physical therapists, acting on Dr. Clavijo's orders, directed him to ride an exercise bicycle. Fomby alleged that Clavijo and Manor Care failed to disclose to him that riding a bicycle posed a risk of dehiscence, or rupture, of his surgical leg wound. He alleged that, during his daily physical therapy sessions on the bicycle, his surgical leg wound seeped blood. Nevertheless, Manor Care personnel directed him to continue riding the bicycle and, in fact, increased the resistance on the bicycle and the duration of his rides. Fomby alleged that, "in January," while riding the exercise bicycle, his surgical leg wound ruptured.

Fomby alleged that Dr. Clavijo should have ordered Manor Care physical therapists not to employ bicycle riding as a therapy. Further, the bicycle riding should have been stopped when Manor Care physical therapists first noted that Fomby's surgical leg wound was seeping blood. Fomby alleged that the motion of riding the bicycle caused excessive tension on his surgical leg wound, rupturing the skin. He further alleged that Clavijo and Manor Care, immediately after the rupture, should have transferred him back to Memorial Hermann to repair the rupture.

3

Instead, they waited a week, until January 26, 2014, before transferring him to the emergency room at Memorial Hermann for surgical repair.

Fomby further alleged that, on January 29, 2014, he was again transferred from Memorial Herman back to Manor Care for wound care and physical therapy. While at Manor Care, he developed severe diarrhea from antibiotics that were prescribed to treat an infection in his surgical leg wound. Fomby alleged that, on two occasions, in either late February or early March 2014, Manor Care nursing staff failed to respond to his repeated requests for assistance to the restroom in his room. During his attempts to walk to the restroom unassisted, he lost control of his bowels and fell, soiling the dressing on his surgical leg wound and the furniture and surroundings in his room. In his first fall, he injured his existing surgical leg wound and his right foot and "big toe." He alleged that, after his second fall, nursing staff did not change the soiled dressing on his surgical leg wound until the wound care nurse arrived for her shift an hour later.

Fomby alleged that after he was transported back to Memorial Hermann for the treatment of an infection in his surgical leg wound, he was diagnosed with a Methicillin-resistant-Staphylococcus-aureus ("MRSA") infection, underwent excisional debridement of the wound and placement of a wound vacuum,[7] and, in

_____

[7]     Dr. Chowdhury, appellant's expert, explains in her report that a wound vacuum is a dressing that promotes healing of chronic wounds. It involves the controlled application of sub-atmospheric pressure to the local wound environment, using a

December 2014, amputation of the "big toe" of his right foot. Fomby alleged that Dr. Clavijo and Manor Care should have monitored his open wound for infection and delays should not have occurred between the onset of infection and his transport to Memorial Hermann for treatment.

Fomby sued Dr. Clavijo and Manor Care for negligence, alleging that their individual breaches of the standard of care in treating him had caused him to undergo additional surgery, lengthened the time he spent in nursing homes, and caused him physical injury, medical expenses, pain and suffering, lost wages, physical impairment, and mental anguish. To support his claims, Fomby filed and served upon Clavijo and Manor Care a medical expert report[8] authored by Sumita Chowdhury, M.D., M.P.H., F.A.C.C., M.B.A.

Dr. Clavijo and Manor Care objected to Dr. Chowdhury's report on the ground that her curriculum vitae ("CV") was not included. Clavijo further objected to Chowdhury's report on the ground that she was not qualified to opine as to the issue of causation and that her report failed to adequately address the element of causation. Manor Care objected to Chowdhury's report on the ground that she was not qualified to opine as to applicable standard of care and causation and that her report failed to

---

sealed wound dressing connected to a vacuum pump. The continued vacuum draws fluid from the wound and increases blood flow to the wound.

[8] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a).

5

adequately address the elements of the standard of care and causation. The trial court sustained Clavijo's and Manor Care's objections and granted Fomby thirty days to file and serve amended reports.

Fomby then filed and served Dr. Chowdhury's "Supplemental Expert Witness Report" and CV. Chowdhury, in her report and CV, states that she is a cardiologist "trained at" Massachusetts General Hospital, Harvard Medical School, and she was, from 2006 to 2014, board certified in cardiology and internal medicine. She has authored numerous peer-reviewed publications and cardiology textbook chapters. She is licensed to practice in the state of Texas and states that she was practicing medicine in Texas at the time of Fomby's injuries. Dr. Chowdhury further states:

> My experience includes ambulatory preventive medical care, emergency care, urgent care, inpatient care, intensive care unit management, invasive procedures including permanent pacemaker placement, and management of patients who have undergone coronary artery bypass surgery during their preoperative, postoperative, long-term care, vein harvest wound healing and rehab periods.

Dr. Chowdhury states that, based on her review of Fomby's medical records and Fomby's representations, he underwent coronary-artery bypass surgery emergently on December 20, 2013. A vein for the surgical bypass was harvested from his lower right leg. Fomby was 65 years old and had "severe comorbidities and risk factors that would put him at a very high risk for wound dehiscence after major surgery," including insulin-dependent diabetes mellitus, diabetic neuropathy, hyperlipidemia, chronic kidney disease with a previous episode of acute renal failure

6

requiring hemodialysis, anemia, obesity, and hypertension. Chowdhury explained that, based on Fomby's risk factors, his "peripheral arteries in his lower extremities would be expected to have severely compromised blood flow" and his "risk for poor wound healing and risk of dehiscence was very high." She noted that Fomby's leg wound was a "slow healing wound" and "was healing at a rate significantly slower than a patient without the numerous risk factors of a dehiscence" that Fomby's condition presented. Chowdhury notes that, during the postoperative period at Memorial Hermann, Dr. William Nguyen documented that Fomby had cellulitis in his lower legs. Fomby was placed on intravenous antibiotics and discharged to a skilled nursing facility, Manor Care, to continue the antibiotics and wound care.

Dr. Chowdhury notes that, based on Fomby's medical records, the primary objective of his admission to Manor Care on January 13, 2014 was "wound healing," with respect to his "surgical leg wound." The next day, although Dr. Clavijo, the admitting physician at Manor Care, noted that Fomby had edema in his lower legs and an infection, Clavijo did not inspect the wound or order a wound vacuum. Further, without having evaluated the wound, Clavijo ordered that Fomby undergo unrestricted physical therapy.

On approximately January 20, 2014, Fomby's surgical leg wound ruptured as he was riding an exercise bicycle during physical therapy exercises administered by Manor Care physical therapists, who were carrying out Dr. Clavijo's orders.

7

Nevertheless, the "first wound evaluation performed and documented" by Clavijo was not until two days later, on January 22, 2014, when Clavijo documented only redness of skin. On January 24, 2014, Clavijo documented continued cellulitis, however, he neither documented a wound evaluation, nor ordered a wound vacuum. On January 26, 2014, Fomby was transferred back to Memorial Hermann to repair the rupture of his surgical leg wound. Dr. Chowdhury notes that, immediately upon Fomby's return to Memorial Hermann, Dr. Nguyen ordered a wound vacuum.

Dr. Chowdhury states that, when Fomby was re-admitted to Manor Care three days later, he developed a "C. diff. toxin related diarrhea." Although Manor Care records indicated that nursing staff had been apprised of Fomby's special needs to go to the bathroom, they failed, on March 18, 2014, to attend to Fomby's "multiple buzzed requests" for assistance to the bathroom. Fomby, who was in a weakened state from the C. Diff toxin, attempted to get to the bathroom unassisted and "fell from an explosive diarrhea episode and could not get up," saturating the dressing on his surgical leg wound with feces. Chowdhury stated that "Fomby believe[d]" that nursing staff "carelessly cleaned" his surgical leg wound and his room because they were in a hurry to leave at 7:00 a.m., when their work shift ended. Nursing staff also did not properly clean his room, which had fecal matter on the floor and furniture. Manor Care nursing staff then left Fomby's wound undressed and open to the air in his contaminated room until the next shift arrived at 8:00 a.m. and dressed the

8

wound. Chowdhury opines that the nursing staff's superficial cleaning of Fomby's surgical leg wound and leaving the wound undressed and open in a room that still had fecal matter on the floor and furniture resulted in a MRSA infection in Fomby's surgical leg wound, which required surgical debridement at Memorial Hermann.

Dr. Chowdhury opines that the standard of care applicable to Dr. Clavijo, a physician treating a wound, is to recognize the risk factors with which Fomby presented, including a significant risk of dehiscence of the surgical leg wound. The standard of care also required that, upon Fomby's arrival at Manor Care, the dressing covering the surgical leg wound be removed and the wound inspected, and that a wound vacuum be ordered. Chowdhury explained:

> Inspection of the wound by a physician can reveal information pertinent to a patient's treatment, therapy and recovery, including . . . the presence or extent of any infection; how . . . the wound [is] healing after more than 3 weeks from surgery; does the surgical leg wound need cleaning and re-dressing now; the space between each stitch, staple, or other fastener and the risk of dehiscence implied by the distance between each fast[e]ner; how close the stitches, staples or other fasteners are to the edge of the wound; whether the stitches, staples or fasteners are beginning to tear or are holding satisfactorily; assessing the risks of tearing or wound dehiscence; whether the ordering of wound vacuum treatment is indicated.

Chowdhury further opines that the standard of care applicable to a physician treating a wound on a patient with Fomby's risk factors is to restrict any physical therapy that would place excess stress on the immediate area surrounding the wound.

9

Dr. Chowdhury opines that Dr. Clavijo breached the standard of care applicable to a physician treating a wound by not inspecting Fomby's leg wound upon his admittance to Manor Care, by not ordering a wound vacuum, and by ordering that Fomby undertake unrestricted physical therapy.

As to causation, Dr. Chowdhury opines that Dr. Clavijo's departures from the standards of care applicable to wound treatment caused Fomby's surgical leg wound to deteriorate to a status of "non-healing" and dehiscence, requiring "acute care transfer, prolonged hospital stay, and painful incomplete recovery."

With respect to Manor Care, Dr. Chowdhury opines that the applicable standard of care for its physical therapists, as healthcare providers, is to be familiar with risk factors for post-surgery dehiscence of wounds during physical therapy, i.e., age, circulatory issues, diabetes, neuropathy, and obesity; to disclose to the patient the risk of dehiscence; and "to not put a patient in an unsafe position." Chowdhury opines that Manor Care, through its physical therapists, breached the standard of care by not disclosing the risk of dehiscence and placing Fomby on an exercise bicycle with a tension level of "8." As to causation, she opines that Manor Care's departures, through its physical therapists, from the standard of care caused the dehiscence of Fomby's surgical leg wound.

Dr. Chowdhury opines that the applicable standard of care for Manor Care's nursing staff, as healthcare providers, is to respond within a reasonable period of

time to requests from patients for assistance, to promptly and thoroughly clean a wound that has become contaminated, to promptly and thoroughly clean a room and furniture that have become contaminated, and to not leave an open wound undressed in a contaminated room. Chowdhury opines that Manor Care, through its nursing staff, breached the standards of care by not responding to Fomby's requests for assistance within a reasonable time; not promptly and thoroughly cleaning his wound and environment after his wound dressing, room, and furniture became contaminated with feces; and leaving the wound open and undressed in a contaminated room for over an hour. As to causation, Chowdhury opines that the departures of Manor Care, through its nursing staff, from the standards of care caused Fomby to fall and contract a MRSA infection in his surgical leg wound, which necessitated additional surgery, lengthened the time that he spent bed-ridden in a nursing home, and caused diminished mobility, pain and suffering, and emotional distress.

Dr. Clavijo moved to dismiss Fomby's claims on the grounds that Dr. Chowdhury's report, as supplemented, still did not reflect that she was qualified to opine as to the applicable standard of care and, as pertinent here, failed to adequately address causation. Manor Care moved to dismiss Fomby's claims against it on the grounds that Chowdhury's report, as supplemented, did not demonstrate that she was

11

qualified to opine on the issues of the standard of care and causation and failed to sufficiently address the elements of the standard of care and causation.

After a hearing, the trial court denied Dr. Clavijo's and Manor Care's motions to dismiss Fomby's claims.

**Expert Report**

In his first and second issues, Dr. Clavijo argues that the trial court erred in denying his motion to dismiss Fomby's claims against him because Dr. Chowdhury's report does not demonstrate that she is qualified to opine on the issue of the standard of care applicable to an internist and does not adequately address the issue of causation. In its first and second issues, Manor Care argues that the trial court erred in denying its motion to dismiss Fomby's claims against it because Dr. Chowdhury's report does not demonstrate that she is qualified to opine on the issue of the standard of care applicable to physical therapists and nursing staff at a nursing care facility or on the issue of causation, and does not adequately address the issues of the standard of care and causation.

**A.     Standard of Review and Overarching Legal Principles**

We review a trial court's decision on a motion to dismiss a health care liability claim for an abuse of discretion. *See Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001); *Gray v. CHCA Bayshore L.P.*, 189 S.W.3d 855, 858 (Tex. App.—Houston [1st Dist.] 2006, no pet.). We apply the same

12

standard to a trial court's determination that an expert is qualified. *See Broders v. Heise*, 924 S.W.2d 148, 151–52 (Tex. 1996); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex. App.—Houston [14th Dist.] 2008, no pet.). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to guiding rules or principles. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010). When reviewing matters committed to a trial court's discretion, we may not substitute our own judgment for that of the trial court. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). A trial court does not abuse its discretion merely because it decides a discretionary matter differently than an appellate court would in a similar circumstance. *Harris Cty. Hosp. Dist. v. Garrett*, 232 S.W.3d 170, 176 (Tex. App.—Houston [1st Dist.] 2007, no pet.). However, a trial court has no discretion in determining what the law is or in applying the law to the facts. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

A health care liability claimant must timely provide each defendant health care provider with an expert report. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(a) (West 2017); *Gray*, 189 S.W.3d at 858. An expert report means a "written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or

13

damages claimed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (West 2017). If a defendant files a motion to dismiss, challenging the adequacy of a claimant's expert report, a trial court must grant the motion only if it appears, after a hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report or is not sufficiently specific to provide a basis for the trial court to conclude that the claims have merit. *Id*. § 74.351(l); *Scoresby v. Santillan*, 346 S.W.3d 546, 555–56 (Tex. 2011).

Although the report need not marshal all the plaintiff's proof, it must include the expert's opinions on the three statutory elements, i.e., the standard of care, breach, and causation. *See Palacios*, 46 S.W.3d at 878–79. To be considered a good-faith effort, the report must inform the defendant of the specific conduct that the plaintiff calls into question and must provide a basis for the trial court to conclude that the claims have merit. *Id*. at 879. A report that merely states the expert's conclusions as to the standard of care, breach, and causation does not fulfill these purposes. *Id*. Rather, the expert must explain the basis of her statements and must link her conclusions to the facts. *Wright*, 79 S.W.3d at 52. The trial court, in assessing the sufficiency of the report, may not draw inferences, but instead must rely exclusively on the information contained within the four corners of the expert report or its accompanying curriculum vitae. *See In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 463 (Tex. 2008).

**B.    Dr. Clavijo**

1.    *Expert's Qualifications*

In his first issue, Dr. Clavijo asserts that Dr. Chowdhury's report and CV do not demonstrate that she is qualified to opine as to whether he, an internist, departed from the accepted standards of care applicable to wound care and physical therapy of a leg wound in a nursing home facility setting. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a) (West 2017).

A person may qualify as an expert witness on the issue of whether a physician departed from standards of medical care only if the person is a physician who:

(1)    is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;

(2)    has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a).  "Practicing medicine" or "medical practice" includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians.  *Id.* § 74.401(b).  "In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim

15

arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial training or experience in an area or medical practice relevant to the claim and (2) is actively participating in rendering medical care services relevant to the claim." *Id.* § 74.401(c).

Dr. Clavijo first asserts that Dr. Chowdhury is not qualified to testify regarding the standard of care applicable to an internist because she is a cardiologist. In determining whether an expert is qualified, the Texas Supreme Court has cautioned against drawing expert qualifications "too narrowly." *Larson v. Downing*, 197 S.W.3d 303, 305 (Tex. 2006); *see also Owens v. Handyside*, 478 S.W.3d 172, 186–87 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). To qualify as an expert, a physician need not be a practitioner in the same specialty as a defendant. *See Broders*, 924 S.W.2d at 153–54. The plain language of section 74.401 "focuses not on the defendant doctor's area of expertise, but on the condition involved in the claim." *Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *see also McKowen v. Ragston*, 263 S.W.3d 157, 162 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Thus, an expert is not required to "be able to articulate the standard of care applicable to a specialty other than his own." *McKowen*, 263 S.W.3d at 162. "The focus . . . is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant." *Broders*, 924 S.W.2d at 153. The critical

16

inquiry is "whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Id.*

This Court has held that a physician whose specialty differs from that of the defendant may be qualified to provide an expert report if she "has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant" or "if the subject matter is common to and equally recognized and developed in all fields of practice." *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (general surgical practices such as postoperative care); *see also Tawa v. Gentry*, No. 01–12–00407–CV, 2013 WL 1694869, at *7 (Tex. App.—Houston [1st Dist.] Apr. 18, 2013, no pet.) (mem. op.) (expert sufficiently qualified to opine on standard of care by showing injury involved was of type he treated in his practice); *Hillery v. Kyle*, 371 S.W.3d 482, 487 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding expert who stated familiarity "with the standards of care relevant to the condition involved in th[e] claim" and had "diagnosed and treated patients with the conditions similar to those experienced by" plaintiff was qualified to opine on standard of care).

Here, the subject matter of the claim against Dr. Clavijo involves the standards of care in the treatment of an open wound and the prevention of infection. "[T]he care and treatment of open wounds and the prevention of infection are subjects

17

common to and equally recognized and developed in all fields of practice, thus any physician familiar with and experienced in the subject may testify as to the standard of care." *Legend Oaks—S. San Antonio, L.L.C. v. Molina*, No. 04-14-00289-CV, 2015 WL 693225, at *4 (Tex. App.—San Antonio Feb. 18, 2015, no pet.) (mem. op.); *see Khan v. Ramsey*, No. 01-12-00169-CV, 2013 WL 1183276, at *6 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.) (holding that expert with over eighteen years of medical experience, including ambulatory, urgent, and emergent care, possessed specialized knowledge on subject matter common to and equally recognized and developed in all fields of practice, i.e., recognizing importance of patient history and infection process); *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.) ("[T]he standard of care in the infection process . . . is common to and equal in all fields of medical practice."); *see also Gonzalez v. Padilla*, 485 S.W.3d 236, 243–44 (Tex. App.—El Paso 2016, no pet.) (care and treatment of open wounds and prevention of infection are common to and equal in all fields of medical practice).

Dr. Chowdhury, in her report[9] and CV, states that she is licensed to practice in Texas and was practicing medicine in Texas at the time Fomby's claim arose, in

---

[9] Generally, an amended expert report served after a thirty-day extension granted by the trial court supersedes any initial report filed by the claimant. *Otero v. Leon*, 319 S.W.3d 195, 204–05 (Tex. App.—Corpus Christi 2010, pet. denied); *HealthSouth Corp. v. Searcy*, 228 S.W.3d 907, 909 (Tex. App.—Dallas 2007, no pet.) (holding that amended expert report "supplants" previously filed report). However, when an

2014. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(1); *San Jacinto Methodist Hosp.*, 256 S.W.3d at 813. Chowdhury, in her report and CV, states that she is a cardiologist "trained at" Massachusetts General Hospital, Harvard Medical School, and was board certified in cardiovascular diseases by the American Board of Internal Medicine from 2004 to 2014, i.e, at the time that Fomby's injuries occurred. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(c) (providing that court must consider whether, at time claim arose, or at time testimony is given, expert witness was board certified); *San Jacinto Methodist Hosp.*, 256 S.W.3d at 813. She has also authored numerous cardiology textbook chapters and peer-reviewed publications, and has written extensively on post-operative care, including the care of diabetic patients after vascular surgery, as here.

Dr. Chowdhury states that she has over 15 years of experience in clinical cardiology patient care, including "providing care in intensive care units" and "long-

---

expert report has been "supplemented," as here, courts have considered both the original and supplemental reports in conducting an analysis of the adequacy of the reports. *See also Packard v. Guerra*, 252 S.W.3d 511, 515–16, 534–35 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (considering previously filed reports that were refiled and "supplemented"). The expert report requirement may be satisfied by utilizing more than one expert report, and a court may read the reports together. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i) (West 2017); *Cornejo v. Hilgers*, 446 S.W.3d 113, 120 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). Here, although Dr. Chowdhury's report filed after the thirty-day extension granted by the trial court is titled a "supplement," in it she reiterates, and expounds on, the statements in her original report. Thus, we consider only her "supplemental" expert report in conducting our analysis.

term care facilities," "while patients undergo rehab after cardiovascular surgery," and in

> ambulatory preventive medical care, emergency care, urgent care, inpatient care, intensive care unit management, invasive procedures including permanent pacemaker placement, and *management of patients* who have undergone coronary artery bypass surgery *during their* preoperative, *postoperative*, long-term care, *vein harvest wound healing and rehab periods*.

(Emphasis added.) *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(3), (c). Chowdhury is presently employed by the Preventive Med Center of Houston, where her experience includes providing "ambulatory and inpatient care in intensive care units, step-down units, medical floors, long-term care facilities, and while patients undergo rehab after cardiovascular surgery."

Dr. Chowdhury asserts that she has "knowledge of the accepted standards of care of what a reasonably prudent physician would do or not do when treating patients with the conditions involved in this claim" and is "familiar with breaches of the standard of care that can occur and result in harm to a patient" similar to Fomby. She opines that the standard of care applicable to Dr. Clavijo, a physician treating a wound, is to recognize the risk factors with which Fomby presented, including a significant risk of dehiscence of the surgical leg wound. The standard of care also required that, upon Fomby's arrival at Manor Care, the dressing covering the surgical leg wound be removed and the wound inspected, and that a wound vacuum be ordered. Chowdhury explained:

20

> Inspection of the wound by a physician can reveal information pertinent to the patient's treatment, therapy and recovery, including . . . the presence or extent of any infection; how . . . the wound [is] healing after more than 3 weeks from surgery; does the surgical leg wound need cleaning and re-dressing now; the space between each stitch, staple, or other fastener and the risk of dehiscence implied by the distance between each fast[e]ner; how close the stitches, staples or other fasteners are to the edge of the wound; whether the stitches, staples or fasteners are beginning to tear or are holding satisfactorily; assessing the risks of tearing or wound dehiscence; whether the ordering of wound vacuum treatment is indicated.

*See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(2). Further, the standard of care required that Clavijo restrict any physical therapy that would place excess stress on the immediate area surrounding the surgical wound.

Based on her report and CV, the trial court could have reasonably concluded that Dr. Chowdhury possesses knowledge on subject matter that is common to, and equally recognized and developed in, all fields of practice, i.e., wound care and the infection process. *See Keo*, 76 S.W.3d at 732; *see also Methodist Health Ctrs. v. Crawford*, No. 01-14-00291-CV, 2014 WL 5500492, at *3 (Tex. App.—Houston [1st Dist.] Oct. 30, 2014, no pet.) (mem. op.) (holding report in which medical expert stated that he "underst[ood] not just what the standard of care requires, but also what is likely to occur if the standard of care is not met," coupled with specific references to standards of care, demonstrated familiarity with applicable standards). Further, Chowdhury has specialized knowledge in the area of post-operative care of diabetics, like Fomby, and over 15 years of medical experience in cardiology patient

21

care, including "providing care in intensive care units" and "long-term care facilities," "while patients undergo rehab after cardiovascular surgery," and, specifically, management of patients who have undergone coronary bypass surgery during their "postoperative vein harvest wound healing" and "rehab periods." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401(a)(3).

Dr. Clavijo asserts that Dr. Chowdhury's report and CV do not reflect that she is qualified to opine on the standard of care applicable to the treatment of a wound because her report and CV do not show that she "treats patients in a nursing home." An expert is not required to have practiced in a specific type of facility, so long as her general work experience and knowledge establishes an ability to offer a sufficient opinion on proper practices. *See Gonzalez*, 485 S.W.3d at 243–44 (physician qualified to opine on standard of care pertaining to rehabilitation specialist); *see also IHS Acquisition No. 131, Inc. v. Crowson*, 351 S.W.3d 368, 372 (Tex. App.—El Paso 2010, no pet.) (physician who had never worked in nursing home qualified to testify regarding standard of care applicable to nursing home care based on knowledge and experience with condition and practices at issue).

Dr. Clavijo asserts that Dr. Chowdhury's CV is inadequate because it does not identify her specific job title at Preventive Med Center. Dr. Chowdhury's CV does, however, list her experience at Preventive Med Center. Again, the critical inquiry is "whether the expert's expertise goes to the very matter on which he or she is to

22

give an opinion." *Broders*, 924 S.W.2d at 153. "The focus . . . is on the 'fit' between the subject matter at issue and the expert's familiarity therewith, and not on a comparison of the expert's title or specialty with that of the defendant." *Id.*

To the extent that Dr. Clavijo suggests that Dr. Chowdhury's statements in her report or CV are not credible, for purposes of our review of the adequacy of a medical expert report under Chapter 74, we take the statements in the report as true. *See Crawford*, 2014 WL 5500492, at *1 n.1; *Marino v. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied).

We conclude that, based on her report and CV, the trial court could have reasonably concluded that that Dr. Chowdhury is qualified to render an expert opinion on the standard of care applicable to Dr. Clavijo in this case. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.401. Accordingly, we hold that the trial court did not err in denying Clavijo's motion to dismiss Fomby's health care liability claims against him on this ground.

We overrule Dr. Clavijo's first issue.

2. *Sufficiency of the Report*

In his second issue, Dr. Clavijo argues that the trial court erred in denying his motion to dismiss Fomby's claims because Dr. Chowdhury's expert report does not constitute a good faith effort to comply with the causation requirement of section 74.351(r)(6). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Clavijo

23

argues that Chowdhury's expert report is conclusory because it does not adequately set out a causal connection between the alleged breach of the standard of care and alleged harm.

A causal relationship is established by proof that the negligent act or omission constituted a substantial factor in bringing about the harm and absent the act or omission, the harm would not have occurred. *Costello v. Christus Santa Rosa Health Care Corp.*, 141 S.W.3d 245, 249 (Tex. App.—San Antonio 2004, no pet.). Again, however, an expert report need not marshal all of the plaintiff's proof necessary to establish causation at trial, and it need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court. *Wright*, 79 S.W.3d at 52. Rather, an expert report must provide a fair summary of the expert's opinions regarding the causal relationship between the failure of the health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. *Id.* at 52–53. The expert must simply provide some basis that a defendant's act or omission proximately caused injury. *Id.* at 53. And, the expert must explain the basis of his statements and link her conclusions to the facts. *Id.* at 52. "No particular words or formality are required [in the expert report], but bare conclusions will not suffice." *Scoresby*, 346 S.W.3d at 556.

In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four

corners of the report. *Wright*, 79 S.W.3d at 52. However, section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history. *Granbury Minor Emergency Clinic v. Thiel*, 296 S.W.3d 261, 265 (Tex. App.—Fort Worth 2009, no pet.). Whether an expert's factual inferences made in the expert report are accurate is an issue for summary judgment, not a Chapter 74 motion to dismiss. *Hood v. Kutcher*, No. 01-12-00363-CV, 2012 WL 4465357, at *4 (Tex. App.—Houston [1st Dist.] Sept. 27, 2012, no pet.) (mem. op.); *see Gannon v. Wyche*, 321 S.W.3d 881, 892 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Methodist Hosp. v. Shepherd–Sherman*, 296 S.W.3d 193, 199 n.2 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

Here, in setting out the causal connection between the standard of care and the harm, Dr. Chowdhury, in her report, notes that, based on Fomby's medical records, the primary objective of his admission to Manor Care was "wound healing," with respect to the "surgical leg wound." She opines that the standard of care required that Clavijo, as a physician treating a wound, recognize the risk factors with which Fomby presented, which included a significant risk of dehiscence. The standard of care also required that Clavijo, upon Fomby's arrival at Manor Care, remove the dressing and inspect his wound, and that a wound vacuum be ordered. Dr. Chowdhury explained:

> Inspection of the wound by a physician can reveal information pertinent to a patient's treatment, therapy and recovery, including . . . the

25

presence or extent of any infection; how . . . the wound [is] healing after more than 3 weeks from surgery; does the surgical leg wound need cleaning and re-dressing now; the space between each stitch, staple, or other fastener and the risk of dehiscence implied by the distance between each fast[e]ner; how close the stitches, staples or other fasteners are to the edge of the wound; whether the stitches, staples or fasteners are beginning to tear or are holding satisfactorily; assessing the risks of tearing or wound dehiscence; whether the ordering of wound vacuum treatment is indicated.

Further, the standard of care required that Clavijo restrict Fomby from any physical therapy that would place excess stress on the immediate area surrounding the surgical wound.

Dr. Chowdhury opines that Dr. Clavijo breached the standard of care applicable to a physician treating a wound by not recognizing the risk factors with which Fomby presented, which included a significant risk of dehiscence, not inspecting Fomby's leg wound upon his admittance to Manor Care, not ordering a wound vacuum, and by ordering that Fomby undertake unrestricted physical therapy. Although the primary objective of his admission to Manor Care on January 13, 2014 was "wound healing," with respect to the "surgical leg wound," and Clavijo, as the admitting physician at Manor Care, noted the next day that Fomby had edema in his lower legs and a "surgical wound infection," Clavijo did not inspect the wound or order a wound vacuum. Further, without having evaluated the wound, Clavijo ordered that Fomby undergo unrestricted physical therapy.

26

On approximately January 20, 2014,[10] Fomby's surgical leg wound ruptured as he was riding an exercise bicycle, during physical therapy exercises ordered by Dr. Clavijo and administered by Manor Care physical therapists. However, the "first wound evaluation performed and documented" by Clavijo, was not until January 22, 2014, when he documented only redness of skin. On January 24, 2014, although Clavijo documented continued cellulitis, he did not document a wound evaluation and did not order a wound vacuum. Thus, Dr. Chowdhury inferred from Clavijo's having not documented a wound evaluation that such did not occur. *See Hood*, 2012 WL 4465357, at *5 (expert inferred from doctor's lack of documentation concerning any exploration, cleaning, or wound care procedures used, that wound was not appropriately explored and treated); *Quinones v. Pin*, 298 S.W.3d 806, 813 (Tex. App.—Dallas 2009, no pet.) (holding that medical expert could rely on silence of medical records to support inferences); *Thiel*, 296 S.W.3d at 265 (noting that section 74.351 does not prohibit experts from making inferences based upon patient's medical history); *see also Gannon*, 321 S.W.3d at 892 (noting that accuracy of

---

[10] Dr. Clavijo argues that Dr. Chowdhury's report is insufficient because she relied, in part, on Fomby's allegations. In formulating an adequate expert report, the Texas Supreme Court has held that an expert "may consider and rely on the plaintiff's pleadings," so long as the expert "at least considered and commented on the patient's medical records to the extent the records and their contents—or lack of appropriate contents—are relevant to the expert's opinion." *Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012). In this portion of her report, Chowdhury states that she considered both Fomby's allegations *and his medical records*. *See id*.

27

expert's inferences is issue for summary judgment, not for section 74.351 motion to dismiss). Further, on January 26, 2014, Fomby was transferred back to Memorial Hermann to repair the rupture of his surgical leg wound. Chowdhury noted that, immediately upon Fomby's return to Memorial Hermann, Dr. Nguyen ordered a wound vacuum.

With respect to causation, Dr. Chowdhury opined that Dr. Clavijo's departures from the standards of care, i.e., lack of proper wound care upon admission, lack of access to a wound vacuum, and ordering that Fomby undergo unrestricted physical therapy, despite not having evaluated Fomby's wound, caused Fomby's surgical leg wound to deteriorate to a status of "non-healing," caused the dehiscence of his surgical leg wound while he was riding an exercise bicycle during a physical therapy session at Manor Care, and caused him to undergo "acute care transfer, prolonged hospital stay, and painful incomplete recovery."

In *Hood*, the plaintiff-patient, who had fallen on broken glass and suffered a laceration to his right thigh, was provided with wound care by the defendant-doctor and discharged home. 2012 WL 4465357, at *1. A month later, a CT scan revealed the presence of multiple pieces of glass still in the wound, requiring surgical removal. *Id.* The patient's post-operative course of care was lengthy, and he required multiple follow-up evaluations. *Id.* The patient sued the doctor for negligence and provided the report of an expert. *Id.* The doctor moved to dismiss

28

his claim on the ground that the report was conclusory as to the element of causation, in that it failed to link the alleged breaches of the standard of care to the harm suffered. *Id.* This Court concluded that the expert had set out the applicable standard of care, which required the doctor to visualize, inspect, and properly clean the wound upon initial presentment. *Id.* at *6. In addition, the expert set out a breach of the standard of care by inferring, from the doctor's lack of documentation concerning any exploration, cleaning, or wound care procedures used, that the wound was not appropriately explored and treated. *Id.* Further, the expert opined that the patient's post-operative course, which included surgery, would not have occurred but for the doctor's failure to evaluate and care for the patient's laceration. *Id.* In affirming the trial court's order denying the doctor's motion to dismiss, we concluded that the expert report adequately linked the expert's conclusions to the particular facts of the case and provided a fair summary of his opinions concerning the causal connection between the doctor's breach and the harm suffered. *Id.* at *7.

Here, like the expert in *Hood*, Dr. Chowdhury, in her report, links her conclusions to the particular facts of the case. *See id.* at *6. We conclude that Chowdhury's report provides a fair summary of the causal relationship between Dr. Clavijo's failure to meet the appropriate standard of care and the injuries suffered by Fomby. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6); *Hood*, 2012 WL 4465357, at *6. Thus, the report presents an objective, good faith effort to comply

29

with the statute. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l); *Scoresby*, 346 S.W.3d at 555–56.[11] Accordingly, we hold that the trial court did not err in denying Clavijo's motion to dismiss Fomby's claims on the ground that the expert report did not adequately address the issue of causation.

We overrule Dr. Clavijo's second issue.

## C. Manor Care

In its second issue, Manor Care argues that the trial court erred in denying its motion to dismiss Fomby's claims against it because Dr. Chowdhury's expert report does not constitute a good faith effort to comply with the standard of care or causation requirements of section 74.351(r)(6). *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). Manor Care asserts that Chowdhury's opinions regarding its physical therapists and nursing staff are conclusory, vague, and speculative, in that she does not identify the standard of care, or articulate the actions that Manor Care should have taken, and she does not link the alleged breaches of the standard of care to the alleged harm.

---

[11] Having concluded that Fomby's health care liability claim contains at least one viable liability theory, as evidenced by an expert report meeting the statutory requirements, we do not reach whether his expert report is sufficient as to his other liability theories. *See Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630–31 (Tex. 2013); *SCC Partners, Inc v. Ince*, 496 S.W.3d 111, 115 (Tex. App.—Fort Worth 2016, pet. dism'd) ("[I]f at least one alleged claim, theory, or cause of action in a health care liability suit has expert support, then the legislative intent of deterring frivolous suits has been satisfied.").

Identifying the standard of care in a health care liability claim is critical: whether a defendant breached its duty to a patient cannot be determined absent specific information about what the defendant should have done differently. *Palacios*, 46 S.W.3d at 880. Again, an expert report means a written report by an expert that provides a "fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6). While a "fair summary" is something less than a full statement of the applicable standard of care and how it was breached, it must set out what care was expected, but not given. *Palacios*, 46 S.W.3d at 880. The report must provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question and (2) it must provide a basis for the trial court to conclude that the claims have merit. *Scoresby*, 346 S.W.3d at 556. A report that wholly fails to set out the standard of care or does so in a conclusory manner is deficient and does not constitute a good-faith effort to meet the statute's requirements. *Palacios*, 46 S.W.3d at 880.

31

## 1. *Physical Therapists*

With respect to Fomby's negligence claim against Manor Care based on its physical therapists administering therapy on an exercise bicycle, Dr. Chowdhury, in her report, opines that "placing Mr. Fomby on a bike with a tension level setting at 8" put him in an "unsafe position." She opines that the "applicable accepted standard [of care] for physical therapists in overseeing bike riding is to not put the patient in an unsafe position."

Dr. Chowdhury's statement does not constitute a statement of a standard of care because it does not articulate anything specific about what Manor Care's physical therapists should have done differently. *See Palacios*, 46 S.W.3d at 880 (holding that whether defendant breached its duty to patient cannot be determined absent specific information about what defendant should have done differently and holding that expert's statement that "precautions to prevent [the patient's] fall were not properly used is not a statement of a standard of care"). Although she states that a "tension level setting at 8" is "unsafe," Chowdhury does not define such tension or resistance level in any meaningful way or relate it to any particular reference range for the bicycle that Fomby was riding. For instance, a tension level of "8" on a bicycle with a range of 1 to 10 might represent a high resistance, or 80 percent of the maximum; whereas, an "8" on a bicycle with a range of 1 to 20 might represent less than half the maximum resistance, or 40 percent. Manor Care and the trial court are

32

left to speculate about what an ordinarily prudent physical therapist would have done differently, particularly in light of Dr. Clavijo's order for "unrestricted physical therapy." *See id.*

The standard of care is defined by what an ordinarily prudent healthcare provider would have done under the same or similar circumstances. *Id.* While a fair summary is something less than a full statement of the applicable standard of care, "even a fair summary must set out what care was expected, but not given." *Id.* We conclude that Dr. Chowdhury's statement does not constitute a statement of a standard of care because she does not set out what care was expected. *See id.*

With respect to Fomby's informed-consent claim against Manor Care, based on the care rendered by its physical therpists, Dr. Chowdhury, in her report, states, "I have had discussions with [Fomby] on two occasions," and, "[f]or purposes of rendering this report, I rely on the following non-exclusive representations by [Fomby:] . . . That Manor Care physical therapists did not discuss or mention the risks of a wound rupture in riding a bike." In addition, "Fomby has represented to me that [neither] Manor Care, nor any of its physical therapists, . . . obtain[ed] his informed consent at any time or prior to Manor Care physical therapists['] order to ride a bike." Chowdhury opines that, "had the risks and hazards of a wound dehiscence occurring while riding a bike been disclosed, this information could have [i]nfluenced [Fomby] . . . in making a decision to give or withhold consent," and

33

"[i]t is quite possible that [Fomby] would have withheld consent." She concludes, thus, that the failure to disclose the risks of dehiscence "directly and proximately resulted in causation of dehiscence in [Fomby's] leg wound."

Dr. Chowdhury asserts, and Manor Care does not dispute, that the Texas Medical Disclosure Panel has not specifically determined what risks or hazards must be disclosed by a physical therapist prior to beginning a physical therapy regimen on an exercise bicycle. In such cases, the duty is that "otherwise imposed by law." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.106(b) (West 2017); *see also Baylor Univ. Med. Ctr. v. Biggs*, 237 S.W.3d 909, 914 n.3 (Tex. App.—Dallas 2007, pet. denied). Here, the duty "otherwise imposed by law" is to "disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.101 (West 2017); *Binur v. Jacobo*, 135 S.W.3d 646, 654–55 (Tex. 2004). Further, in an informed-consent claim, causation has two parts: (1) whether a reasonable person could have been influenced, in deciding whether to give or withhold consent, by information concerning the risks and hazards that was not disclosed and (2) whether the injury complained of was caused in fact by the undisclosed risk. *Quinones*, 298 S.W.3d at 814. Manor Care argues that Chowdhury's report is insufficient as to both parts.

34

As a preliminary matter, Manor Care asserts that Dr. Chowdhury's report is inadequate because she, in formulating her report, relied on Fomby's representations without stating that she had compared them against, or even considered, any of the medical records.

The Texas Supreme Court has held that, in formulating a report, an expert:

> may consider and rely on the plaintiff's pleadings, but the expert must consider more than the pleadings. How much more will depend on the particular circumstances of the claim. But we fail to see how in most instances . . . an expert report could be adequate unless the expert at least considered and commented on the patient's medical records to the extent the records and their contents—or lack of appropriate contents—are relevant to the expert's opinion.[12]

---

[12] The supreme court reasoned:

> [T]he purpose of an expert report is to give the trial court sufficient information within the four corners of the report to determine if the plaintiff's claim has merit. . . . If an expert could formulate an adequate expert report by merely reviewing the plaintiff's pleadings and assuming them to be true, then artful pleading could neutralize the Legislature's requirement that expert reports demonstrate the plaintiff's claims have merit. . . . That is because the facts and circumstances alleged in the plaintiff's pleadings might omit or misstate, inadvertently or otherwise, matters critical to a valid expert opinion. An expert report based only on the plaintiff's pleadings could mask the context of the medical services or health care rendered. Significant matters involved in the rendition of the care, such as the patient's complaints or the health care provider's findings, could warrant investigation and examination beyond that which might otherwise seem to have been appropriate, yet be unknown to the expert. If such matters were not in the plaintiff's pleadings the expert would not have considered them, the expert report would not reference them, and because they are outside the four corners of the report, the trial court could not consider them in deciding whether the plaintiff's claims have merit. That is not what we believe the Legislature intended.

*Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012).

*Loaisiga v. Cerda*, 379 S.W.3d 248, 261 (Tex. 2012).

Because Dr. Chowdhury affirmatively states that she formulated her opinions pertaining to Fomby's informed-consent claim based wholly on his representations, her report does not reflect that she considered any of Manor Care's records pertaining to Fomby's informed-consent claim, and she does not comment on any lack of such record, we conclude that her report is inadequate to comply with the statute. *See Loaisiga*, 379 S.W.3d at 261; *Hous. Methodist Hosp. v. Nguyen*, 470 S.W.3d 127, 131 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (holding that, in formulating opinions, "medical expert must consider, at a minimum, medical records that are relevant to those opinions, along with the pleadings"); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351.

### 2. *Nursing Staff*

With respect to Manor Care's nursing staff, Dr. Chowdhury states that, on March 18, 2014, nursing staff, despite having been apprised of Fomby's "C. diff. toxin related" illness and "special needs to go to the bathroom," failed to attend to his "multiple buzzed requests for assistance" for approximately 15 minutes. When Fomby attempted to get to the bathroom unassisted, he "fell from an explosive diarrhea episode and could not get up," saturating the dressing on his surgical leg wound and causing fecal matter to contact the floor and furniture in his room. Dr. Chowdhury asserts that "Fomby's leg wound was cleaned carelessly" and "Fomby

36

believes superficially, without attention to cleanliness," because a nursing staff shift change was underway. She also states that "Manor Care personnel did not properly clean the room." Furthermore, nursing staff left Fomby's uncovered for an hour, during a shift change.

Dr. Chowdhury opines that the applicable standard of care requires that nursing staff respond to patient requests for assistance "within a reasonable period of time"; that a "wound covered with excrement saturated dressing should be cleaned thoroughly and not carelessly or superficially"; that a room with fecal matter on the floor and furniture should be "thoroughly and properly" cleaned; and that a wound "should not be left uncovered for more than an hour in a room" not "properly" cleaned.

Dr. Chowdhury opines that Manor Care's nursing staff breached the standard of care by not responding to Fomby's requests for assistance for over 15 minutes; by "carelessly" and "superficially" cleaning his wound; by not "properly" cleaning his room for "more than an hour"; and by leaving his wound uncovered for an hour. Chowdhury further opines that these breaches "directly and proximately resulted in a MRSA infection in [Fomby's] surgical leg wound."

Again, aside from noting that Fomby's medical records indicate that nursing staff was apprised of his bathroom needs and did not respond to his request for assistance for over 15 minutes, Dr. Chowdhury does not state that she considered

37

any medical records in formulating her opinion that nursing staff "carelessly" cleaned Fomby's wound. She states, rather, that "Fomby believes" that his wound was "superficially" cleaned. Further, she expressly states that, in formulating her report, she relied on Fomby's representations that "Manor Care nurses left the . . . surgical wound undressed and uncovered" and "that the room was not properly cleaned."

Because Dr. Chowdhury affirmatively states that she formulated her opinions based on Fomby's beliefs and representations, her report does not reflect that she considered any of Manor Care's records pertaining to Fomby's claims based on the nursing staff's care of his wound, and she does not comment on any lack of such record, her report is inadequate to comply with the statute. *See Loaisiga*, 379 S.W.3d at 261; *Hous. Methodist Hosp.*, 470 S.W.3d at 131 (holding that, in formulating opinions, "medical expert must consider, at a minimum, medical records that are relevant to those opinions, along with the pleadings"); *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351.

In addition, Dr. Chowdhury opines that the applicable standard of care requires that nursing staff respond to patient requests for assistance "within a *reasonable* period of time"; that a "wound covered with excrement saturated dressing should be cleaned *thoroughly* and *not carelessly or superficially*"; that a room with fecal matter on the floor and furniture should be "*thoroughly and*

*properly*" cleaned; and that a wound "should not be left uncovered for more than an hour in a room" not "*properly*" cleaned. (Emphasis added.) Again, these do not constitute statements of standards of care because they do not articulate anything specific about what Manor Care's nursing staff should have done differently. *See Palacios*, 46 S.W.3d at 880 (holding that expert's statement that "precautions to prevent [the patient's] fall were not properly used is not a statement of a standard of care").

Again, the standard of care is defined by what an ordinarily prudent healthcare provider would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880. While a fair summary is something less than a full statement of the applicable standard of care, "even a fair summary must set out what care was expected, but not given." *Id.* Here, Dr. Chowdhury does not set out what care was expected. *See id.* We hold that the trial court erred in denying Manor Care's motion to dismiss Fomby's health care liability claims.

We sustain the portion of Manor Care's second issue in which it asserts that Dr. Chowdhury's expert report does not constitute a good faith effort to comply with the standard-of-care requirements of section 74.351(r)(6).

Having held that Dr. Chowdhury's report is substantively inadequate, we need not consider the causation element of Manor Care's second issue or consider Manor

Care's first issue, in which it argues that Chowdhury is not qualified to render an opinion as to the standard of care applicable Manor Care or as to causation.

## Conclusion

We affirm the trial court's interlocutory order denying Dr. Clavijo's motion to dismiss Fomby's claims. We reverse the trial court's interlocutory order denying Manor Care's motion to dismiss Fomby's claims against it and remand for further proceedings consistent with this opinion. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b).

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Bland.